JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICKY NGUYEN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ENDOLOGIX, INC., et al., <br><br> Defendants. | Case No. 17-00017-AB (PLAx) <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** |

Before the Court is Defendants' Endologix, Inc., John McDermott, and Vahseem Mahboob's (collectively, "Defendants") Motion to Dismiss Second Amended Complaint ("Motion," Dkt. No. 77). Plaintiff Vicky Nguyen ("Plaintiff") filed an Opposition, and Defendants filed a Reply.[1] The Court heard oral argument on August 10, 2018. For the following reasons, the Court **GRANTS** the Motion.

## I. PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff alleges that Defendants made false and misleading statements in violation of federal securities laws. She brings claims for herself and on behalf of

---

[1] The Court **GRANTS** Defendants' Request for Judicial Notice ("RJN," Dkt. Nos. 76, 75-1) seeking judicial notice of certain SEC filings, conference call transcripts, press releases, and articles published in scientific journals. These materials are either referenced in the SAC or are SEC filings. There is no dispute as to their authenticity, the RJN is unopposed, and these materials are noticeable under Fed. R. Evid. 201.

persons who purchased Endologix stock between May 5, 2016 and May 18, 2017. Second Amended Complaint ("SAC," Dkt. No. 72) ¶ 1. The main allegations follow.

      Defendant Endologix is a medical device company, and John McDermott was its CEO and Vaseem Mahboob was its CFO during the relevant period. SAC ¶¶ 2, 36-38. Endologix's prospects rested substantially on Nellix, a device used to manage aneurysms. *Id.* ¶ 3. Whereas other devices function by repairing aneurysms, Nellix seals them, and avoids risks of endoleaks (i.e. blood leaking into the aneurysm sac) and device migration (i.e. the device moving from its initial placement). *Id.* ¶ 3. Nellix was also touted as a "one size fits all device," meaning that it could be used to treat every patient anatomy, including those with complex anatomies. *Id.* ¶ 4. The gravamen of the SAC is that Defendants failed to adequately disclose the risk that the Food and Drug Administration ("FDA") either might not give pre-market approval to Nellix, or might delay its approval.

      In order to market Nellix in the United States, Endologix needed premarket approval ("PMA"), "the most stringent application" to the FDA, and which requires valid scientific evidence establishing that the device is safe and effective. *Id.* ¶ 6. The FDA gave Endologix an Investigational Device Exemption ("IDE") to conduct a clinical trial of Nellix to support its PMA application. *Id.* ¶ 74. This clinical trial, called the EVAS Forward IDE, began in January 2014. In May 2016, Endologix told investors that it had submitted positive clinical data to the FDA to support its PMA application. *Id.* ¶ 6.

      During the class period, Defendants "flooded investors with rosy results from their clinical findings and repeatedly stated that they were on track to receive FDA approval of Nellix in the U.S. at the end of 2016" or early 2017. *Id.* ¶ 9. In conference calls and press releases, Defendants assured investors that everything in the data looked positive, and, regarding the potential for FDA approval and Endologix's interactions with the FDA there was nothing "that's given us heartburn." *Id.* ¶ 9. These statements, with the misleading portions of the lengthier statements in bold

print, along with Plaintiff's explanation for why they are false and misleading, are set forth in SAC ¶¶ 141-167. The Court will focus on the subset of statements Plaintiff relies on in her opposition, *see* Opp'n 9:21-10:13, and recites portions of them here:

- On May 5, 2016, at the Deutsche Bank Health Care Conference, Mahboob stated: "But today, we feel pretty good about the timeline that we've been putting out consistently for the last six months to eight months, which is that we expect the approval to be in the Q4 [2016] to latest Q1 [2017] timeframe . . . So again, on track from a PMA milestone for a Q4 approval." *Id.* ¶ 144.
- On May 9, 2016, in a Q1 2016 Press Release, McDermott stated: "For Nellix . . . we remain on track with our timeline for potential FDA approval." *Id.* ¶ 146.
- On May 9, 2016, during its Q1 2016 conference call with investors, Mahboob stated: "Nellix continues to do a fantastic performance outside of the U.S. . . . So I would say, Nellix is doing as expected. No surprises." *Id.* ¶ 148.
- On August 2, 2016, during the Q2 2016 conference call with investors, McDermott stated: "So, the three reasons that the agency will typically consider sending a device to panel is one; if there is any new clinical issues of safety and efficacy and obviously everyone has seen the data so we know there aren't any [safety] issues there." *Id.* ¶ 154.
- On November 1, 2016, during the Q3 conference call with investors, McDermott stated:
  - "Nellix PMA approval time lines are unchanged." *Id.* ¶ 158.
  - "Regarding Nellix, we've recently ran an updated data cut from the IDE clinical database and noticed an increase in migration in aneurysm enlargement in some patients with two-year follow-up. We've learning [sic] that migration can occur in patients with small flow lumens and a lot of thrombus." *Id.* ¶ 159.

3.

- The issue of migration is "a very easy situation to address just by narrowing for those particular anatomies." *Id.* ¶ 161.

Plaintiff alleges that Endologix's statements were untrue. A confidential witness ("CW1") explained that, since 2015, Defendants knew that Nellix had a serious and unsolveable migration problem—the device would move from its initial placement within a patient—that significantly increased the risk of catastrophic consequences for patients. *Id.* ¶¶ 11-12. Defendants learned about the migration problem because since February 2013 (more than 3 years before the class period started), Endologix had been selling Nellix in the commercial channel in Europe. By the time of the class period, Defendants possessed "a trove of clinical information based upon the real-world results of thousands of patients in Europe." *Id.* ¶ 5.

By late 2015, European doctors were increasingly complaining about a migration problem. *Id.* ¶ 12. CW1 stated that McDermott and Mahboob were briefed frequently (weekly or daily) about the increasing numbers of complaints from doctors in Europe. *Id.* ¶ 13. These complaints were stored in the Company database and by October 2015, it was clear that the device was especially dangerous to patients with a lot of thrombus, or blood clotting. *Id.* ¶ 13.

Senior scientists at the company urged McDermott to issue a field safety notice to exclude patients with thrombosis to prevent serious adverse events from Nellix migration, but he refused. *Id.* ¶ 13. By January 2016, McDermott created and oversaw a "task force" to deal with the migration issue, but Endologix could not determine either the cause of, or find a solution to, the migration problem. *Id.* ¶¶ 14, 16. Plaintiff alleges that Defendants intentionally hid the migration problem—and their inability to solve it—from the market. *Id.* ¶ 16. McDermott continued to refuse to issue field safety notices that would narrow its applicability "even after reports from European doctors reached a near-crisis level in March 2016." *Id.* ¶ 16.

Plaintiff alleges that the FDA would not approve Nellix because the "inexplicable and frequent incidences or migration rendered the device unsafe," *id.* ¶

19, yet Defendants "continued to lie to investors," telling them during the Q3 conference call (November 1, 2016) that "the incidences of migration were only discovered during a 'recent data cut' in patients 'with a lot of thrombosis' and that in any event there was an easy fix and that this would not alter Nellix's prospects for FDA approval." *Id.* ¶ 20.

Less than two weeks later, on November 16, 2016, Defendants revealed that because of the migration problem, the FDA required Endologix to complete another two years of patient follow-up data on its clinical trial before it would consider approving Nellix. Endologix's stock fell over 20.5%. *Id.* ¶ 24.

On May 17, 2017, Defendants provided an "update" on Nellix and revealed that they would not seek FDA approval of the first generation Nellix device, but would instead seek approval of a second generation Nellix device. This would require a confirmatory clinical study and push FDA premarket approval out to 2020. *Id.* ¶ 30. On this news, Endologix stock dropped more than 36%.

Based on the above, Plaintiff asserts two counts. Count 1 alleges that all Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5 by making untrue statements of material fact. Count 2 seeks to impose liability on McDermott and Mahboob ("Individual Defendants") under Section 20(a) of the Exchange Act.

Defendants now move to dismiss on numerous bases.

**II.     LEGAL STANDARDS**

   **A. Motion to Dismiss**

Fed. R. Civ. Proc. 8 requires a plaintiff to present a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Fed. R. Civ. Proc. 12(b)(6), a defendant may move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. Proc. 12(b)(6).

To defeat a Rule 12(b)(6) motion to dismiss, the complaint must provide enough detail to "give the defendant fair notice of what the . . . claim is and the

grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must also be "plausible on its face," allowing the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Labels, conclusions, and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (internal quotation marks omitted). The court generally may not consider materials other than facts alleged in the complaint and documents that are made a part of the complaint without converting the motion into one for summary judgment. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996). However, two exceptions allow a court to consider extrinsic evidence without converting a motion to dismiss into a motion for summary judgment. First, the court may consider documents not physically attached to the complaint "if the documents' 'authenticity . . . is not contested' and 'the plaintiff's complaint necessarily relies' on them." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citation omitted). Second, the court can consider undisputed facts that are judicially noticeable. *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988); *Lee*, 250 F.3d at 689-90.

**B. Pleading Standard for Securities Fraud Claims**

A complaint stating claims under Section 10(b) and Rule 10b–5 must satisfy the dual pleading requirements of the PSLRA and Rule 9(b). *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009). The PSLRA requires a plaintiff to plead falsity and scienter with particularity under Rule 9(b). *Id.* Thus, to properly allege falsity, a securities fraud complaint must "'specify

6.

each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed.'" *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)). To adequately plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

## III.   DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this provision, making it "unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c). Section 20(a) makes certain "controlling" individuals also liable for violations of Section 10(b) and its regulations. 15 U.S.C. § 78t(a).

To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (citation omitted).

The gravamen of the SAC is that Defendants made positive statements concerning Nellix's performance and prospects for timely FDA premarket approval, and that these statements were false and misleading because an ongoing and

7.

unsolvable migration problem in the European commercial market meant that Nellix was not "safe and effective" as necessary to secure FDA PMA approval.

Defendants attack the SAC's adequacy on numerous grounds: that the alleged misstatements are opinion and none of the standards for a false opinion are met; that the allegations attributed to CW1 cannot establish falsity; that the SAC fails to plead that the alleged misstatements are material; that the SAC fails to plead scienter; that Defendants' statements are forward-looking statements protected by the PSLRA safe harbor; and that the SAC fails to plead loss causation.

### A. Defendants' "Puzzle Pleading" Argument is Without Merit.

In their introduction to their section attacking Plaintiff's pleading of falsity, Defendants pose some more general attacks. *See* Mot. 9:5-10:9. One of these arguments is that the SAC amounts to "puzzle pleading." This not well taken. Puzzle pleading refers to a complaint that quotes extensively from public statements made by defendants but without specifying the particular statements that are purportedly false or misleading, leaving "defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading." *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000). Here, the SAC quotes from the Defendants' public statements, with each quote followed by an explanation why it is false or misleading, s*ee* SAC ¶¶ 141-167, and Plaintiff further narrowed the statements in issue by focusing her opposition on only a subset of them. Accordingly the charge of puzzle pleading is unfounded.

### B. The SAC Does Not Plead with Particularity Facts Giving Rise To a Strong Inference of Scienter.

The Court finds it unnecessary to parse whether Defendants' statements were opinions, forward-looking statements eligible for safe-harbor protection, or mixed statements; what weight to give allegations based on CW1's statements; or to determine whether Defendants' statements meet the appropriately-calibrated standard of falsity, because the SAC fails to plead facts giving rise to a strong inference of

scienter. As the Ninth Circuit has noted, " 'falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir.2002) (*quoting Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001)). Here, the Court finds it appropriate to focus on whether the relevant allegations give rise to a strong inference of scienter, and to address falsity as necessary within that analysis.

### 1. Pleading Scienter

Scienter is a "mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (internal citation and quotation marks omitted). " '[D]eliberate recklessness' is more than '*mere* recklessness or a motive to commit fraud.' . . . Instead, deliberate recklessness is 'an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.' " *Id.* (quoting *Zucco*, 552 F.3d at 991). As such, "[f]acts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).

As noted above, the PSLRA requires a plaintiff to plead with particularity facts that establish a *strong* inference of scienter. In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court sought to "prescribe a workable construction of the 'strong inference' standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims." *Tellabs*, 551 U.S. at 322. The Court held that "to qualify as 'strong' within the intendment of § 21D(b)(2) . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as

9.

compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 315. The Court also emphasized that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. . . . In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 326.

The Ninth Circuit has further refined this analytical framework. To assess the sufficiency of a plaintiff's scienter pleadings, the court first "determine[s] whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011). "[I]f no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.*

### 2. Plaintiff Has Not Pled Facts Establishing A Strong Inference that Defendants Made False Statements With Scienter.

Plaintiff alleges that Defendants made false statements concerning (1) the timeline and prospects for FDA approval of Nellix (that it would likely be approved late 2016 or early 2017, despite knowing about the migration problem); (2) Nellix's performance ("fantastic") outside of the U.S.; (3) when Endologix discovered the migration issue (when it "recently" ran an updated data cut from the IDE clinical trial data); and (4) that the migration problem would be easy to fix. Plaintiff claims that a strong inference of scienter arises from Defendants' statements because they knew of contemporaneous reports or data that contradicted the statements at the time they were made.

First, to assess the scienter (and falsity) elements, the Court must consider precisely what the allegedly false statements were. Except for Mahboob's statement about Nellix's performance being "fantastic" outside of the U.S., all of the alleged false statements are about the progress of the IDE clinical trial, and there are no facts

pled to show that the IDE clinical trial was not "on track," that migrations began to appear in the IDE clinical data earlier than Defendants stated, or that the other statements were false. As for Mahboob's statement that Nellix was doing a "fantastic" performance outside of the United States, he was responding to an analyst who asked whether "in the direct channel" Nellix was "on the same trajectory as we have been seeing over the last couple of quarters." And Mahboob responded, "Nellix continues to do a fantastic performance outside of the U.S. [] So I would say Nellix is doing as expected. No surprises." SAC ¶ 148. These characterizations as "fantastic" and "doing as expected" are simply too ambiguous to be material to the question of PMA approval, or to establish a strong enough inference of falsity or scienter. For example, Mahboob could be referring to sales of Nellix, and Plaintiff points to no facts showing sales in the direct channel were not "fantastic" or "doing as expected" in the direct channel.

In contrast to the First Amended Complaint, Plaintiff has now pled facts *suggesting* that Endologix reported results from the European commercial channel—including, presumably, reports of migration—to the FDA. But, Plaintiff has not pled facts showing that the FDA delayed and rejected the PMA based on those anecdotal reports of migrations from the European commercial market. Insofar as Plaintiff's theory is that, because Defendants already knew about the migration problem based on the European market, they knew the same problem would arise in the Nellix IDE trial and thwart approval, the SAC lacks sufficient connective facts. For example, the SAC fails to allege facts that tend to show that applications of Nellix in the European commercial channel are sufficiently similar to the application of Nellix in the IDE clinical trial to be relevant to PMA approval. Indeed, the SAC includes allegations suggesting that at least some of the European standards defined migration as only 4mm (SAC ¶ 97) whereas the definition of migration applied to the IDE clinical trial was 10mm (SAC ¶ 134). As such, that the European commercial channel resulted in migrations of 4mm is not necessarily germane to whether the IDE clinical trial would

also show significant migrations of 10ml—more than twice the European distance.

Furthermore, the allegations also give rise to inferences of nonfraudulent intent. Defendants' anticipated timeline for PMA approval was keyed to the results from the Nellix IDE clinical trial, not to the anecdotal evidence from the European commercial channel where the migration problem was first discovered. As such, Defendants statements that approval was on track based on the IDE clinical trial can be construed as lacking fraudulent intent. And, on May 26, 2016, Endologix released results from that trial, which were positive, *see* SAC ¶ 87, and on June 11, 2016, submitted the results to the FDA as part of the PMA submission. SAC ¶ 88. Then, after the IDE clinical trial was concluded, Endologix ran an "updated data cut" that disclosed an increased in migration at the two-year follow-up point. Plaintiff characterizes McDermott's accompanying November 1, 2016, statement as saying that Endologix only recently discovered the migration problem in general, but Plaintiff misconstrues the statement: McDermott was referring to the updated IDE clinical data cut as "recent," not to Endologix's discovery of the migration problem as recent. In that light, there is no inference of scienter because the statement is not misleading. Likewise, Plaintiff argues that McDermott's statement that the migration problem would be easy to fix shows scienter because they knew from the European channel that they could not fix it. But again, Plaintiff mischaracterizes Defendants statement. McDermott did not say that migration could be *fixed*, just that it would be a "very easy situation *to address*" by narrowing the IFU to exclude patients who were prone to migration. SAC ¶ 161 (emphasis added). Plaintiff does not allege that that statement "easy to address" was false. As such, no inference of fraudulent intent arises.

In sum, viewing the SAC as whole, an inference of nonfraudulent intent arises: Defendants believed that PMA approval turned on the results of the IDE clinical study, not on anecdotal reports from the European commercial channel; that the migration problem uncovered in the European commercial channel was not material because those applications were not subject to the same standards that governed the

IDE study; and that once migrations did emerge in the IDE clinical study, that problem could be overcome by revising the IFU to exclude patients with anatomies prone to migration. Thus, Defendants could have nonfraudulently believed that Nellix PMA approval was on track, as they stated.

The Court cannot find that the inference of scienter Plaintiff proposes "is at least as strong" as the above inference of nonfraudulent intent. Plaintiff's inference is premised on mischaracterizations of the allegedly false statements, and Plaintiff fails to plead facts establishing that the European migrations were material to the IDE clinical trial, even if the FDA had data from Europe. Setting aside these difficulties, Defendants' statements, to the extent they may be considered inaccurate, can be attributed to optimism that the migration problem that eventually emerged in the IDE trial could be overcome by the revised IFU. The Court finds this inference of nonfraudulent intent to be stronger than Plaintiff's proposed inference of scienter. The Court therefore cannot find that inference of scienter at least as compelling, or as least as strong, as the inference of nonfraudulent intent. As such, Plaintiff has not satisfied the PSLRA's heightened pleading standard for scienter, and her claim for violation of Section 10(b) and Rule 10b-5 must be dismissed.

Because Plaintiff has not adequately pled a primary violation of the SEC Act, the Section 20(a) claim likewise fails.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss Second Amended Complaint. This is Plaintiff's third attempt to plead a her claims, and it does not appear that she can plead facts to establish a strong inference of scienter. The case is therefore **DISMISSED** with prejudice.

**IT IS SO ORDERED.**

Dated: September 6, 2018

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

13.